# IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR CELL PHONES SEIZED DURING THE EXECUTION OF A SEARCH WARRANT AT 434 WEST JEFFERSON STREET, APARTMENT CW216 | **UNDER SEAL**<br><br>**Case No. 4:20mj258-MAF** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Pullen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four electronic devices—described in Attachment A, which are currently in law enforcement possession, and the extraction from that property of the electronically stored information described in Attachment B.

2.      I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Miami Field Division, Tallahassee Resident Office. I have been employed by the DEA for approximately 12 years. During this time, I have participated in criminal investigations involving local, national, and international drug trafficking organizations. I have worked with other international, federal, state, and local agencies in the conducting these investigations. In connection with

my official DEA duties, I investigate criminal violations of federal laws, including but not limited to, Title 21, United States Code, Sections 841(a)(1), 843(b) and 846 (drug-trafficking offenses).

3.     I have participated in investigations involving the interception of wire communications, the interception of electronic communications, the use of video surveillance, and the debriefing of cooperating defendants. I am familiar with the manner in which narcotics traffickers and money launderers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, the structures of their organizations, their use of cellular telephones and related technologies, and their use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions. Further, I have participated in numerous narcotic investigations in which I have conducted or participated in physical surveillance, electronic surveillance, undercover transactions, and the execution of search warrants.

4.     The facts contained in this affidavit come from my personal observations, my training and experience, as well as information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is further described in Attachment A, and consists of four electronic devices (referred to collectively as "the Devices"):

a.      Device #1 is a black iPhone in a clear case and is assigned telephone number (321) 262-7846;

b.      Device #2 is a black, Alcatel flip phone;

c.      Device #3 is a red Apple iPhone with a cracked screen and a cracked clear case; and

d.      Device #4 is a silver Apple iPhone S model A1633 in a clear case.

6.      The Devices were seized during the execution of the search warrant at 434 West Jefferson Street, Apartment CW216, Tallahassee, Florida, authorized by the Court in NDFL case number 4:20mj252-MAF.

7.      The Devices are currently in the possession of the Drug Enforcement Administration (DEA) at the DEA Tallahassee Resident Office, in Tallahassee, Florida.

8.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

**Initial arrests**

9.     On April 14, 2020, Your Affiant, Drug Enforcement Administration
(DEA) Special Agent (SA) Michael Pullen communicated with Florida Highway
Patrol (FHP) Trooper Nathaniel Cabe regarding FHP arrests of Triniti RUSSELL
on February 1, 2020, and February 18, 2020. Special Agent Pullen subsequently
reviewed FHP reports written about RUSSELL related to those two arrests.

10.     On February 1, 2020, RUSSELL was the driver of a vehicle stopped
by FHP in Leon County for having an expired tag and illegally tinted windows.
During the traffic stop, officers could smell the distinct raw odor of marijuana.
FHP officers proceeded to search the vehicle, and found two clear sandwich-type
bags of marijuana (total weight approximately 30 grams) in the center console of
the vehicle, and, behind the front passenger seat, a green duffle bag and a red and
black backpack. Inside the green duffle bag was more marijuana (total weight of
all marijuana was approximately 4.3 pounds). Inside the red and black backpack
was a loaded Keltec 9 millimeter pistol, suspected oxycodone pills (23 pills, 13.1
grams), suspected alprazolam pills (31 bars, 9.7 grams), suspected amphetamine
pills (24 pills, 5.7 grams), scales, and other drug-related items.

11.     The amphetamine pills field tested positive for amphetamine.

12. RUSSELL was arrested on state charges by FHP and released on bond.

13. On February 18, 2020, RUSSELL was the driver of a vehicle stopped by FHP in Madison County for failing to change lanes or adequately slow for a stopped emergency vehicle on the side of Interstate 10. During the traffic stop, officers could smell the distinct raw odor of marijuana emitting from the passenger side of the vehicle. Officers searched the vehicle and found a black duffle bag in the trunk of the vehicle, containing approximately 2.25 pounds of marijuana. RUSSELL was again arrested on state charges and again was released on bond.

14. Chemical analysis of the suspected oxycodone pills seized from RUSSELL on February 1, 2020, was conducted by a Florida Department of Law Enforcement (FDLE) laboratory and revealed that the suspected-oxycodone-pills actually contained fentanyl.

15. The suspected alprazolam pills did *not* field test positive for alprazolam or any other benzodiazepine-class drug, but have not yet been analyzed by a laboratory. Based on your affiant's experience working cases involving fentanyl-class substances, your affiant believes that when purported alprazolam pills that do not field test positive for a benzodiazepine-class drug, they are often found to contain fentanyl-class substances upon laboratory analysis.

16.     A total of six cellphones were obtained from RUSSELL during these two traffic stops. A federal search warrant was obtained for these cell phones in NDFL case number 4:20mj103-MAF, but attempts to access the cellphones have thus far been unsuccessful due to encryption. Pursuant to Rule 41(e)(2)(B), off-site attempts to access the data continue.

17.     All of the drug exhibits (with the exception of the already analyzed suspected-oxycodone-pills, which were already determined to contain fentanyl) have been submitted to the DEA lab and are awaiting analysis results.

**Federal indictment and initial attempts to arrest RUSSELL**

18.     On August 4, 2020, RUSSELL was indicted in the Northern District of Florida on charges of, among other things, armed drug trafficking in violation of Title 18, U.S.C. § 924(c). On August 6, 2020, surveillance units from the DEA Tallahassee Resident Office (TRO) and the FHP established surveillance in the vicinity of 918 Chestwood Avenue, Tallahassee, FL. This address was listed on RUSSELL's Florida Driver's License. In addition, RUSSELL had a no-bond warrant for her arrest out of Leon County, FL that had led Leon County Sheriff's Office Deputies to this house on previous dates as well.

19.     Upon arriving at the residence at approximately 11:00am, investigators knocked on the door. Lisa Russell (Triniti RUSSELL's mother, identified from the photo from her Florida Driver's License) answered the door.

Lisa Russell refused to open the door more than a few inches. Your Affiant asked if Triniti RUSSELL was there and Lisa Russell stated that she was not and maintained an uncooperative and inpatient demeanor throughout the encounter. Your Affiant left his phone number with Lisa Russell and informed her that Triniti RUSSELL had a federal arrest warrant for armed narcotics trafficking. Your Affiant further stated that the safest thing for Triniti RUSSELL would be for her to come to the door immediately or call Your Affiant as soon as possible. Your Affiant stated that it was dangerous for law enforcement and Triniti RUSSELL for her to remain on the run with an armed trafficking warrant. Lisa Russell was visibly unimpressed by the sentiment and shut the door.

20. Upon returning to their vehicle, investigators noted a Gray colored Honda Accord bearing Florida license tag CTD7817 in the driveway. FHP Troopers determined this vehicle was assigned to Triniti RUSSELL. At that point, investigators again knocked on the door in an attempt to get Triniti RUSSELL to come to the door of the residence with negative results.

21. On August 24, 2020, Your Affiant reviewed phone toll analysis of the events that occurred on August 6, 2020. Through open source intelligence, Your Affiant was able to identify that Lisa Russell (Triniti RUSSELL's mother) utilized phone number 850-322-6745. Your Affiant was also able to identify (through open source intelligence) that Damien Russell (Triniti RUSSELL's father) utilized

7

phone number 850-321-7086 and that Destini Russell (Triniti RUSSELL's sister) utilized phone number 850-212-8448. It should also be noted that Your Affiant recently called Destini Russell at that phone number, and, during the call, she identified herself by name.

22. Your Affiant reviewed the phone toll analysis of Lisa Russell and noted that, at approximately 11:10am on August 6, 2020 (approximately the same time that investigators spoke with her), she called (321) 262-7846 (the telephone number for Device #1). Lisa Russell then called Damien Russell who immediately called Lisa Russell back. Approximately 15 minutes after calling Damien Russell, Lisa Russell called a law office.

23. Based on this toll analysis and Your Affiant's training and experience, You Affiant believes that immediately after speaking with investigators, Lisa Russell called Triniti RUSSELL to tell her investigators were looking for her. Lisa Russell is believed to have then called her husband/Triniti RUSSELL'S father (Damien Russell) to discuss the dilemma. After the mother and father spoke, it is believed they called an attorney to discuss their options.

24. On August 24, 2020, Your Affiant received a response to an administrative subpoena from Sprint. In their response, Sprint identified the user of (321) 262-7846 as Triniti RUSSELL with the listed address of 918 Chestwood Avenue, Tallahassee, Florida.

25.     On August 25, 2020, Your Affiant and the U.S. Attorney's Office applied for and were granted a search warrant to obtain geolocation information for RUSSELL's cellphone, (321) 262-7846, in NDFL case number 4:20mj237-MAF.

## September 8 arrest and search warrant

26.     On September 8, 2020, United States Marshall Service (USMS) Fugitive apprehension task force members developed information that RUSSELL was staying in Apartment CW216 of the College Wood Apartments located at 434 West Jefferson Street, Tallahassee, FL.   At approximately 11:00 am, while conducting surveillance of the apartment complex, USMS Deputy Marshall Chase Goller observed RUSSELL exit apartment CW216 to walk a dog in the apartment complex and return to apartment CW216.

27.     At approximately 11:30 am, members of the USMS knocked on the door of apartment CW216 three to five times.   RUSSELL called through the door to the USMS that the door was unlocked and she was lying on the floor. RUSSELL refused to open the door for the USMS.

28.     Members of the USMS opened the door of the residence to be searched and entered to arrest RUSSELL.   RUSSELL, while laying on the floor approximately 10 feet inside of the apartment, was asked if anyone else was inside of the residence to be searched but RUSSELL refused to answer.   Upon entering the residence to arrest RUSSELL, USMS conducted a security sweep of the

9

apartment to assess and manage any threats for officer safety. During the security sweep, USMS members located a female identified as Destyni Barnes (Barnes). RUSSELL was arrested without further incident.

29. In addition to Barnes, USMS members observed suspected illegal drugs, drug scales, packaging materials for illegal drugs, as well as a drum magazine for a gun. Specifically, USMS members observed a clear plastic bag that had been thrown into the toilet in the bathroom. The clear plastic bag contained a white powdery substance, scales, as well as smaller bags that are consistent with repackaging drugs into smaller quantities for resell. Due to the bag containing evidence and the likelihood of said evidence being destroyed if it remained in the toilet, DEA SA Michael Pullen removed the bag from the toilet and placed in on the counter beside the toilet to prevent destruction of the evidence. In the bedroom, USMS observed a green leafy substance believed to be marijuana. There were also plastic bags and packaging material. The suspected marijuana and packaging material were on top of a dresser in the bedroom. Also on the dresser was a clear plastic bag that contained what was believed to be Ecstasy pills. On the floor beside the dresser was more packaging material to include at least one large bag that appeared to have been vacuum-sealed. The bag contained marijuana residue.

30.     Your affiant applied for and was granted a search warrant for the above-mentioned apartment, in NDFL case number 4:20mj252-MAF. (The warrant also authorized the search of a motor vehicle parked near the apartment, but no significant items were located during the search of the motor vehicle.)

31.     During the execution of the search warrant, the following items were found in the apartment:

32.     Device #1 was found underneath a pillow on the master bed. Your Affiant had previously called (321) 262-7846 (which is the phone number previously identified as belonging to RUSSELL) in an attempt to get her to come to the door while the USMS was knocking on it. Upon finding Device #1, Your Affiant noted that the screen was already lit up and noted that the display of Device #1 indicated that it had received the corresponding phone call from Your Affiant, identifying Device #1 as RUSSELL's cellphone with call number (321) 262-7846.

33.     Next to the master bed, on the floor, inside a grey and red backpack the following items were located:

    a.     2 large bags of marijuana (one containing approximately 6 ounces, and one containing approximately 7 ounces)

    b.     59 tabs of suspected LSD (lysergic acid diethylamide)

    c.     38 small blue pills purporting to be oxycodone

    d.     3 20mg Adderall pills (amphetamine)

e.    8 unknown small blue pills

f.    1 digital scale

g.    A bag of mushrooms (approximately 5 grams)

h.    A small bag of cocaine HCL (approximately 1 gram)

i.    22.5 Alprazolam 2mg pills

j.    14 multicolored pills suspected to be MDMA

k.    8 one gram prepackaged THC wax "resin shatter" papers

l.    5 one-milliliter HI-C THC vape juice refills.

34.    Next to the gray and red backpack, a black handbag was found which contained the following:

a.    A S&W M&P Shield 9mm pistol with serial number # HTT4373 . This gun was reported stolen out of Thomasville, Georgia.

b.    Approximately $6,000 in US currency (10 1$ bills, 16 5$ bills, 12 10$ bills, 122 20$ bills, 29 50$ bills, 19 100$ bills).

c.    Device #2, Device #3, and Device #4

d.    A black "Jolt" handheld Taser

35.    In the same bedroom, under a pile of clothing, a set of scales, and 5 plastic bags containing 3 ounces of marijuana, were found.

36. In the same bedroom, in a large white garbage bag, 16 large vacuum seal bags containing marijuana residue were found, and 7 large plastic bags (not-vacuum seal style) containing marijuana residue.

37. In the same bedroom, on top of a bedroom dresser, investigators found 4 small plastic bags containing a total of 14 grams of marijuana; a plastic bag containing 8 MDMA pills packaged with two 20mg Adderall pills.

38. In the same bedroom, in the bottom drawer of the dresser, investigators found:

    a.    A gram of an unknown white powdery substance

    b.    A spoon with drug residue on it

    c.    A bag containing 1 gram of prepackaged THC wax "resin shatter" paper

    d.    3 large bags of marijuana, containing 4 ounces, 7 ounces, and 1 ounce respectively

39. In the closet to the same bedroom, investigators found:

    a.    A plastic bag containing a THC gummy worm edible

    b.    A plastic bag containing 150 mg THC cereal edible bar

    c.    2 bags of "top shelf" branded commercial marijuana

    d.    4 large bags of marijuana, containing 3 ounces, 6 ounces, 4 ounces, and 3 ounces respectively

e. A black duffle bag containing 8 large plastic bags, containing 16 ounces, 17 ounces, 4 ounces, 4 ounces, 7 ounces, 17 ounces, 16 ounces, and 17 ounces respectively, total weight approximately 6.45 pounds of marijuana

40. In the bathroom adjacent to the same bedroom, investigators found:

a. A plastic bag containing 28 grams of cocaine HCL

b. A small plastic bag containing 7 grams of INOSITOL filler, which can be used as a cutting agent to dilute cocaine

c. A large number of small baggies

41. In the kitchen, investigators found:

a. A bag containing 74 Alprazolam green colored pills

b. Three small bags of marijuana, including one purporting to containing the "Gelatti" strain of commercial marijuana

c. Various other plastic baggies (paraphernalia)

d. 3.4 Grams cocaine HCL

42. In the refrigerator, investigators found: 42 one gram prepackaged THC wax "resin universal shatter" papers, and 14 one milliliter Hi-C pre-packaged THC vape juice refills.

43. Indicia of RUSSELL's occupancy in the apartment was also found, including RUSSELL's passport, driver's license, credit card, debit card, court

paperwork from Leon County case 2020 CF 340 A related to her February 1, 2020, arrest discussed above, and a certified copy of an order in Madison County case 2020-CA-000015, in which the Florida Department of Highway Safety and Motor Vehicles is pursuing forfeiture of the vehicle that RUSSELL was driving during the February 1 and February 18 traffic stops.

44.  Two troopers from the Florida Highway Patrol assigned to a drug interdiction unit assisted in the execution of the search warrant, and brought a TruNarc handheld narcotics analyzer with them. All of the above-mentioned cocaine HCL tested positive on the TruNarc.

45.  Based on your affiant's training and experience, the amount and variety of controlled substances found in RUSSELL's possession, her continuation of drug trafficking actives while on bond following her first two arrests, her continuance of drug trafficking activities after being informed of her federal indictment, and the fact that she was stopped moving marijuana east along Interstate 10, RUSSELL is believed to be a part of a polydrug, large-scale Drug Trafficking Organization (DTO) in the Northern District of Florida and beyond. The fact that RUSSELL was stopped with a firearm and that a second, stolen firearm was found during the execution of the search warrant also leads your affiant to believe that the DTO has a potential for and possibly engages in violence.

46.   Your Affiant believes that the Devices will have evidence of the foregoing crimes on them—Device #1 is known to belong to RUSSELL and was found in the same bedroom as the majority of the controlled substances recovered above, and Device #2, Device #3, and Device #4 were all found in the same purse as the stolen firearm that was recovered and approximately $6,000, and were also present in the same bedroom as Device #1 and the majority of the controlled substances recovered above.

47.   In your affiant's experience, drug traffickers often use electronic devices to coordinate narcotics transactions both with customers, with their sources of supply, and with individuals providing guidance and direction within the DTO. In your affiant's experience, drug-traffickers often maintain multiple cellular devices in an attempt to anonymize their use of particular two-way communication devices and to avoid law enforcement detection. RUSSELL was in possession of four cell phones on February 1, 2020, and an additional two cell phones on February 18, 2020, which leads your affiant to believe the DTO is using numerous cellular telephones as a means of conducting drug trafficking activities. Here, an additional four cellphones were recovered during the execution of the search warrant described above. As a result, agents believe that evidence of crimes related to conspiracy to commit controlled substance offenses, distribution of controlled substances, and the use of a communication facility to facilitate controlled

substance offenses, may be found by conducting the search described in Attachment A for the information described in Attachment B.

48.     Because cellular telephones function as GPS devices, there is probable cause to believe that the Devices contain data that would reveal locations during and after the crimes outlined herein. Moreover, there is probable cause to believe that searching the Devices will enable law enforcement officers to identify the phone numbers assigned to the Devices. In turn, that information can be used to seek an order commanding the cellular telephone providers to provide the government with historical location information for the Devices.

49.     There is probable cause to believe that the Devices will contain call logs, text messages, and other information that will provide evidence of the above crimes, as well as show who was using the Devices during and after the time frames that the crimes outlined herein were committed.

50.     Based on my training and experience, I know that the Devices are "smartphones" which can allow a user to transfer photographs, videos, text communication, voicemail and contacts from one device to another. The Devices have built in cameras capable of taking photographs and videos. The Devices are able to access the World Wide Web or Internet. The Devices are capable of storing telephone numbers and other contact information. In my training and experience, examining data stored on devices of this type can uncover, among other things,

evidence that reveals or suggests who possessed or used the devices. The Devices can also function as a GPS.

51.     In my training and experience, nearly all drug traffickers possess some sort of records about their illegal business transactions, either in the form of ledgers intentionally created and maintained, or in the form of texts, photographs, receipts, and other such records which are inadvertently maintained.

52.     In my training and experience, drug traffickers often either intentionally or inadvertently maintain photographs, videos, or other such depictions of controlled substances or United States Currency. This may be done in an effort to establish credibility for the traffickers on the street, or to enhance their social position within the drug community (for instance, taking photographs of large amounts of controlled substances or cash to show off their wealth). It may also be done as part of drug transactions, where the seller will send the buyer a photograph of the controlled substance to show its quality.

53.     In my training and experience, photographs, text messages, emails, or other records which show connections between members of a conspiracy are valuable pieces of evidence. The value of some such evidence may be immediately apparent (e.g. text messages or records discussing drug transactions). However, even connections which seem innocuous at the time may be helpful in prosecuting co-conspirators when looked at from the end of an investigation (e.g. photographs

which place co-conspirators at the same place at the same time; or even simply evidence which shows that co-conspirators were friends or associates).

54.     In my training and experience, financial records are valuable evidence in both drug trafficking and money laundering investigations. Such records can help establish the lack of a legitimate source of income (or the lack of a sufficient legitimate source of income), as well as records of expenditures and the movement of money. If a lack of sufficient legitimate income is shown compared to known assets and financial transactions, it allows a jury to infer that any unexplained monetary transfers or conspicuous consumption is evidence of, and the result of, illegal activity. In my training and experience, many people have financial applications on their phones, or use their phones to log in to their banks' websites to check account balances and pay bills.

## TECHNICAL TERMS

55.     Based on my training and experience, I use the following technical terms to convey the following meanings:

56.     Wireless telephone: A wireless telephone (or mobile telephone, cellular telephone, or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually

19

contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

57.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

58.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

59. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate

conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

 e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

 60. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

 61. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

62.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Michael S. Pullen
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this 14th day of September, 2020, Tallahassee, Florida.

MARTIN A. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched consists of the following four electronic devices, collectively referred to as "the Devices." The Devices were seized during the execution of the search warrant at 434 West Jefferson Street, Apartment CW216, Tallahassee, Florida, authorized by NDFL case number 4:20mj252-MAF. The Devices are currently in the possession of the Drug Enforcement Administration (DEA) at the DEA Tallahassee Resident Office, in Tallahassee, Florida. The Devices consist of:

1.    Device #1 is a black iPhone in a clear case and is assigned telephone number (321) 262-7846. Photographs of Device #1 follow:



2.    Device #2 is a black, Alcatel flip phone. Photographs of Device #2

follow:





3.    Device #3 is a red Apple iPhone with a cracked screen and a cracked clear case. Photographs of Device #3 follow:



4.    Device #4 is a silver Apple iPhone S model A1633 in a clear case. Photographs of Device #4 follow on the next page:

 

These are the devices to be searched. The warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

The items to be seized are all of the records on each of the Devices described in Attachment A that relate to violations of Title 21 U.S.C., §§ 841(a)(1), 843(b), or 846 (related to the distribution and possession with intent to distribute controlled substances, a conspiracy to commit said offenses, and the use of a communication facility to commit said offenses) or 18 U.S.C. § 924(c) (related to the possession of a firearm in furtherance of a drug-trafficking offense), involving **Triniti Russell** or **Destyni Barnes** since January 1, 2020, in whatever form, including evidence of:

a. Communications arranging for the sale, distribution, delivery, or purchase of controlled substances;

b. Photographs or videos depicting the possession of controlled substances;

c. Location information, when relevant to show the sale, distribution, delivery, or purchase of controlled substances;

d. Communications regarding the possession or acquisition of firearms;

e. Photographs or videos depicting the possession of firearms;

f. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, including text messages, logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (including any removable storage medium found in such a device, such as an SD card or a SIM card).

This warrant authorizes a review of electronically stored information, communications, other records and information obtained pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.